IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,

v.

Criminal Action No. 3:14cr32

ROBERT HENRY CASPER III,
Defendant.

## AMENDED MEMORANDUM OPINION

This matter comes before the Court on a motion to suppress filed by the defendant, Robert Henry Casper ("Casper"). (Dk. No. 14.) While arresting Casper on a federal supervised release violation, a police officer found a gun in Casper's coat pocket. The government indicted Casper for possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Casper now seeks to suppress the evidence of the gun on Fourth Amendment grounds.

The Court held an evidentiary hearing on the defendant's motion to suppress. The Court finds that the officer violated Casper's Fourth Amendment rights when he searched Casper's coat. The officer conducted this search without a warrant—making the search per se unreasonable. *Katz v. United States*, 389 U.S. 347, 357 (1967). None of the well-delineated exceptions to warrantless searches apply to the facts of the case. Accordingly, the Court will suppress the evidence of the gun.

### I. Facts

Early in the afternoon on February 14, 2014, the Sheriff of Nottoway County, Sheriff Larry Parish, contacted Chief William Abel, the police chief of Burkeville,[1] to inform him that the U.S. Marshals had an arrest warrant out for Casper. (Tr. at 5–9, 41–42.) Through this

---

[1] Burkeville is one of the three towns located within Nottoway County, Virginia. (Tr. at 5.)

conversation, Chief Abel learned that the U.S. Marshals wanted Casper arrested for a federal "probation" violation.[2] (Tr. at 9.) Sheriff Parish also told Chief Abel that Casper was staying with his brother, Rashaun Casper ("Rashaun"), at a local Burkeville motel and that Casper might be armed. (Tr. at 6–9.) After learning this information from Sheriff Parish, Chief Abel conducted a "wanted check" on Casper that provided his date of birth and other identifying information, along with the fact that Casper had fled from the police on at least one occasion. (Tr. at 8.) Chief Abel also spoke with a U.S. Marshal about Casper's arrest warrant. (Tr. at 9.) The U.S. Marshal informed the Chief that, when arresting Casper a few months earlier, the Marshal Service had to fight and tase Casper to subdue him. (Tr. at 9–10.)

As one might expect in a small town like Burkeville, this was not the first time Chief Abel had heard of Casper. In fact, Chief Abel had known Casper and Casper's family since Casper was at least six years old. (Tr. at 5.) Based on his background knowledge of Casper, Chief Abel believed that Casper had prior convictions for drugs, a robbery, and maybe for possession of a gun by a felon. (Tr. at 9.) Chief Abel had also personally arrested Casper five or six years earlier on a state probation violation. (Tr. at 10.)

A few days prior to learning about Casper's arrest warrant, Chief Abel had visited the motel and found out that Rashaun was sharing his motel room with Justice Fowlkes ("Fowlkes"). (Tr. at 11–12.) While visiting the motel on this prior occasion, Chief Abel saw Fowlkes with a knife with a blade approximately seven or eight inches long. (Tr. at 18–19.)

Around 3:00 p.m. on February 14th, Chief Abel arrived at the motel to arrest Casper. (Tr. at 20.) By this time in the afternoon, some snow remained on the ground from the previous day, but the temperature was somewhere in the 50s—likely between 52 and 57 degrees

---

[2] The U.S. Marshals wanted Casper on a federal supervised release violation, but when testifying Chief Abel referred to it as a probation violation. (Tr. at 9.)

Fahrenheit. (Tr. 38–41, 75.) Chief Abel brought four other officers to help him make the arrest. (Tr. at 21.) Two of the officers went to the back window of the motel room. (Tr. at 21.) Chief Abel and the two remaining officers proceeded to the front door. (Tr. at 21.) After Chief Abel knocked on the door, Fowlkes opened the door and gave the Chief permission to enter the room. (Tr. at 21–22.) Once Chief Abel entered the room, he saw two mattresses on the floor in an "L" shape: "[t]he one on the back wall went north to south. The one there to your right as you came in the door went east to west, and it made an L." (Tr. at 23.) Fowlkes and Rashaun sat on the east-west mattress with Fowlkes sitting closer to the door. (Tr. at 24, 27.) Casper, his girlfriend, and their two young children sat on the north-south mattress. (Tr. at 27–28.)

Immediately after entering the room, Chief Abel saw Casper sitting on top of his coat on the mattress and said to him, "Robert, U.S. Marshals have an arrest warrant for you. I got to pick you up." (Tr. at 29, 36.) Casper replied, "okay, Mr. Billy" and stuck up his hands. (Tr. at 29.) Casper allowed Chief Abel to handcuff his hands together in front of his body and then he stood up. (Tr. at 29, 61.) Chief Abel then conducted a quick pat down search of Casper's person and led Casper six to eight feet to the doorway of the motel room. (Tr. at 28–29.) Once in the doorway, Chief Abel turned Casper over to the two other officers. (Tr. at 29–30, 62.) At the time of the arrest, Casper was dressed in a tank top, blue jeans, no socks, and "jelly" shoes.[3] (Tr. at 36.)

Chief Abel testified that no one in the room made any threatening moves or provided any reason for concern. (Tr. at 54–61.) The Chief did not feel threatened, even though he knew that Fowlkes owned a large knife. (Tr. at 54–60.) Chief Abel stated that he had already "had a talk" with Fowlkes about the knife. (Tr. at 55.) Chief Abel was not concerned about Fowlkes and did

---

[3] Chief Abel described jelly shoes as little shoes that look like shoes from Holland. (Tr. at 36.)

not find it necessary to conduct a pat down search of Fowlkes or place him in handcuffs. (Tr. at 55.)

After turning over Casper, Chief Abel went back into the room for the coat. He took "two or three steps back to where the coat was laying on the mattress," picked up the coat, felt something heavy on the right side of the coat, and discovered a gun in the right pocket. (Tr. at 31–32.) Chief Abel testified that his reasons for going back to get the coat were "three prong:" (1) for "officer safety in case there was something in the coat," (2) for "preservation of evidence in case—we were told he might have some weapons—in case there was any weapon in the coat," and (3) "because it was cold." (Tr. at 64.)

After finding the gun, Chief Abel "hollered 'gun' to let everybody else know that there was a gun," but none of the other officers came into the motel room with the Chief. (Tr. at 32.) Fowlkes promptly informed the Chief: "Robert took off running." (Tr. at 32.) The Chief soon found out that Casper had fled on foot to a veneer plant across the street. (Tr. at 32.) Chief Abel left the motel room to join the other officers as they looked for Casper. (Tr. at 32.)

## II. Discussion

Chief Abel searched Casper's coat pocket without a warrant. The Fourth Amendment bars unreasonable searches and seizures. *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 613–14 (1989). Searches without a warrant are per se unreasonable. *Katz v. United States*, 389 U.S. 347, 357 (1967). The Supreme Court, however, has recognized several exceptions to the warrant requirement.

The government argues that four exceptions apply to the search of Casper's coat pocket: (1) the protective sweep exception, (2) the exigent circumstances/clothing exigency exception, (3) the *Terry* stop exception, and (4) the search incident to arrest exception. "The [g]overnment

bears the burden of proving, by a preponderance [of the evidence], the legality of the search and seizure which it intends to introduce at trial." *United States v. Davis*, 657 F. Supp. 2d 630, 636 (D. Md. 2009) *aff'd*, 690 F.3d 226 (4th Cir. 2012) (citing *Nix v. Williams*, 467 U.S. 431, 444 (1984)). The government has failed to carry its burden. The search conducted by Chief Abel does not fall into any of the warrantless search exceptions.

*Exception 1: Protective Sweep Exception*

The protective sweep exception permits officers to, "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Maryland v. Buie*, 494 U.S. 325, 334 (1990). "[T]here must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* Moreover, a protective sweep search is "not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found." *Id.* at 335. The Fourth Circuit has clarified "that the linchpin of the protective sweep analysis is not the threat posed by the arrestee, [but] the safety threat posed by the house, or more properly by unseen third parties in the house." *United States v. Laudermilt*, 677 F.3d 605, 610 (4th Cir. 2012) (internal quotations and citations omitted).

Chief Abel's search of Casper's coat pocket does not fit into the protective sweep exception. The Chief did not search a place where a potentially dangerous third party could be hiding—such as a closet or a bathroom. Instead, Chief Abel searched Casper's coat pocket. All third parties were in plain view and in the same room as Chief Abel and Casper—a very small motel room. Thus, the protective sweep exception does not apply.

*Exception 2: Exigent Circumstances/Clothing Exigency Exception*

In *United States v. Gwinn*, 219 F.3d 326, 333 (4th Cir. 2000), the Fourth Circuit recognized an exigent circumstances exception referred to as the "clothing exigency exception." In *Gwinn*, the officers arrested the defendant in a remote area of West Virginia during the evening hours of early May. *Id.* The defendant had on only blue jeans—with no shirt or shoes—when the officers arrested him outside his trailer. *Id.* After arresting the defendant, the officers entered the trailer to check on the safety of third parties and to conduct a protective sweep of the premises. *Id.* at 329–30. After ensuring the safety of the third parties, the officers left the trailer, but then one officer reentered the trailer to retrieve a shirt and boots for the defendant. *Id.* at 330.

The Fourth Circuit found that "an officer is authorized to take reasonable steps to address the safety of [an] arrestee and [an] arrestee's partially clothed status may constitute an exigency justifying the officer's temporary reentry into [an] arrestee's home to retrieve clothes reasonably calculated to lessen the risk of injury to the defendant." *Id.* at 333. The Court relied on several factors to apply the clothing exigency exception:

> (1) [The officer] was presented with an objective need to protect [the arrestee] against the substantial risk of injury to his feet and of chill in the absence of a shirt, (2) there was no evidence or even a claim that [the officer's] reasons for reentering the trailer were pretextual, (3) the intrusion into [the arrestee's] trailer was slight and temporary, particularly in light of the fact that the officers had only moments before lawfully been in the trailer to ensure the safety of [third parties] and had neither completed their business at the site nor left it, (4) the intrusion was strictly limited to the purpose of retrieving shoes and clothing, and (5) the purpose of the reentry and seizure of the boots was not to serve a governmental interest, but to ensure [the arrestee's] reasonable safety while he was in the government's custody.

*Id.* at 333–34. The Fourth Circuit noted that, "in invoking the clothing exception to the warrant requirement, the government bears the burden of demonstrating particularly that the arrestee had a substantial need for the clothing and that the government's response was limited strictly to

meeting that need." *Id.* at 335. The Fourth Circuit explicitly "caution[ed] [officers] against using a clothing exception as a cover for entries made for other purposes." *Id.* at 334–35. Courts allow a clothing exception only when obtaining clothing will further the safety of the arrestee, not when the additional clothing simply "complete[s] the arrestee's wardrobe." *Id.* at 333 (citing *United States v. Butler*, 980 F.2d 619, 621–22 (10th Cir. 1992)).

Chief Abel's search of Casper's coat does not qualify as a search pursuant to the clothing exigency exception. Unlike the arrestee in *Gwinn*, Casper had on shoes, blue jeans, and a shirt. (Tr. at 36.) According to the parties, the temperature at the time of Casper's arrest was somewhere between 52 and 57 degrees Fahrenheit. (Tr. 38–41, 75.) Unlike the defendant in *Gwinn*, Casper did not have a substantial need for a coat. Walking without a coat between the motel room and the police car did not put Casper at a substantial risk for any kind of injury.

*Exception 3:* Terry *Frisk Exception*

Under the *Terry* frisk exception, an officer may make an investigative detention or stop only if supported "'by a reasonable and articulable suspicion that the person seized is engaged in criminal activity.'" *United States v. Foster*, 634 F.3d 243, 246 (4th Cir. 2011) (quoting *Reid v. Georgia*, 448 U.S. 438, 440 (1980)); *see United States v. Burton*, 228 F.3d 524, 527–28 (4th Cir. 2000); *Terry v. Ohio*, 392 U.S. 1, 21 (1968). "'And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *Foster*, 634 F.3d at 246 (quoting *Terry*, 392 U.S. at 21 (1968)). If an officer reasonably concludes that "'the persons with whom he is dealing may be armed and presently dangerous . . . he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault

7

him.'" *United States v. Swann*, 149 F.3d 271, 273 (4th Cir. 1998) (quoting *Terry*, 392 U.S. at 30). The government cannot find shelter for the search of Casper's coat under a *Terry* frisk because Chief Abel did not conduct a *Terry* frisk. Chief Abel did not stop or search any of the individuals in the room other than Casper, and he frisked Casper before he went back for the coat.

*Exception 4: Search Incident to Arrest*

Searches incident to arrest are a well-recognized exception to the warrant requirement of the Fourth Amendment. When conducting a search incident to arrest, an officer may search "the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Chimel v. California*, 395 U.S. 752, 763 (1969). The Supreme Court has provided two justifications for searches incident to arrest: (1) to ensure the safety of the officers and (2) to prevent the concealment or destruction of evidence. *Chimel*, 395 U.S. at 763. These justifications apply not only to the arrestee's person, but also to any area where the arrestee is able to grab, reach, or lunge in order to gain access to a weapon or attempt to destroy evidence—the area "within [the defendant's] immediate control." *Id.* (internal quotations omitted).

Prior to a 2009 Supreme Court ruling, Fourth Circuit case law was clear that "'when a container is within the immediate control of a suspect at the beginning of an encounter with law enforcement officers,' the officers can search the container incident to an arrest if (1) the search is conducted at the scene of the arrest and (2) any delay in the search is a 'reasonable' one." *United States v. Nelson*, 102 F.3d 1344, 1347 (4th Cir. 1996) (quoting *United States v. Han*, 74 F.3d 537, 543 (4th Cir. 1996)). If *Nelson* is still good law, then the Chief's search of the coat was constitutional. Casper's gun was located in a coat pocket that was within Casper's

immediate control at the beginning of the encounter with the officer—Casper was sitting on it. Additionally, Chief Abel conducted the coat pocket search at the scene of the arrest and only a few moments after handcuffing Casper and walking him to the doorway of the motel room.

In 2009, however, in *Arizona v. Gant*, 556 U.S. 332, 346–47 (2009), the Supreme Court significantly narrowed the permitted scope of searches incident to arrest in the context of *vehicular* searches. Prior to *Gant*, courts relied on a bright-line rule from *New York v. Belton*, 453 U.S. 454, 460–61 (1981), that generously allowed an officer, who was lawfully arresting an occupant of a vehicle, to search the passenger compartment of that vehicle as a search incident to arrest. In *Gant*, the Court announced that the police may search the passenger compartment of a vehicle incident to a recent occupant's arrest only (1) "when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search" or (2) "when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Gant*, 556 U.S. at 343 (internal quotations and citations omitted).

The Fourth Circuit has yet to determine whether the rule announced in *Gant* applies to non-vehicular searches. Other courts have split on the issue.[4] The courts that have extended *Gant* to apply outside the vehicular context, such as the Third Circuit in *United States v. Shakir*, 616 F.3d 315 (3d Cir. 2010), have done so because the *Gant* court expressed a "desire to keep

---

[4]*See, e.g., United States v. Shakir*, 616 F.3d 315, 320 (3d Cir. 2010) (applying *Gant* outside the vehicular context); *United States v. Bennett*, No. 08-535, 2010 WL 1427593, at *5–6 (E.D. Pa. Apr. 8, 2010) (same); *United States v. McGhee*, No. 8:09CR31, 2009 WL 2424104, at *3 (D. Neb. July 21, 2009) (same). *But see, e.g., United States v. Bowman*, No. 2:09-cr-182, 2010 WL 749908, at *3–4 (M.D. Ala. Mar. 4, 2010) (finding *Gant* limited to searches of vehicles); *but see also, e.g., United States v. Perdoma*, 621 F.3d 745, 751–53 (8th Cir. 2010) (stating that "while the explanation in *Gant* of the rationale for searches incident to arrest may prove to be instructive outside the vehicle-search context in some cases, we agree with the Government that this is not such a case."); *United States v. Brewer*, 624 F.3d 900, 905–06 (8th Cir. 2010) (finding that "because the cash was seized from Brewer's pants pocket, the holding in *Gant* concerning when the police may search the passenger compartment of a vehicle incident to arrest does not apply.").

the rule of *Belton* tethered to the justifications underlying the *Chimel* exception, and *Chimel* did not involve a car search." *Shakir*, 616 F.3d at 318 (internal quotations and citations omitted). Additionally, "many courts of appeals perceived *Belton* to establish a relaxed rule for searches incident to arrest in all contexts." *Id.* "Because *Gant* foreclosed such a relaxed reading of *Belton*, there is no plausible reason why it should be held to do so only with respect to automobile searches, rather than in any situation where the item searched is removed from the suspect's control between the time of the arrest and the time of the search." *Id.*

The Court finds the Third Circuit's application of *Gant* persuasive. Accordingly, without Fourth Circuit case law on the subject, the Court will follow the Third Circuit in *Shakir* and apply *Gant* to a non-vehicular search.[5] The Third Circuit, in *Shakir*, understood "*Gant* to stand for the proposition that [the] police cannot search a location or item when there is no reasonable possibility that the suspect might access it." *Shakir*, 616 F.3d at 320. The *Shakir* court, however, did not read *Gant* to "prohibit a search incident to arrest whenever an arrestee is handcuffed." *Id.* at 321. Rather, the focus, according to the court, should be on whether a reasonable possibility exists for the arrestee to access the location. *Id.* at 320.

Only after Chief Abel had turned over Casper to two other officers did Chief Abel search the coat. At the point when the search occurred, no reasonable possibility existed for Casper to reach the coat. Casper stood handcuffed with two officers outside the small motel room. At some point, Casper did break away from these officers and run across the street. Casper's escape from the officers, however, does not change the fact that no reasonable possibility existed for Casper to run back into the motel room. Chief Abel stood two to three steps inside the doorway

---

[5] The defendant strongly believes that *Gant* changes the standard for searches incident to arrest in non-vehicular contexts. The government, however, does not appear to take a position on whether *Gant* changes the standard for searches incident to arrest in non-vehicular cases. The government instead argues that even if *Gant* applies, the search was still constitutional.

and between Casper and the coat. Thus, there is no way that Casper could have reentered the room, maneuvered past Chief Abel, and grabbed the coat. Since Casper had no reasonable possibility of reaching the coat, Chief Abel's search of Casper's coat does not qualify as a search incident to arrest.

### III. Conclusion

For the reasons set forth above, the Court grants Casper's motion to suppress.

The Court will enter an appropriate Order.

Date: July 29, 2014
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge